**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CARPROOF CORPORATION, | |
| Plaintiff, | |
| v. | Case No. 1:15-cv-7385 |
| HYPERQUEST INC.; AUDATEX, HOLDINGS, LLC; AUDATEX HOLDINGS, INC.; AUDATEX NORTH AMERICA, INC.; AUDATEX CANADA HOLDINGS, INC.; AND SOLERA HOLDINGS, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT

Plaintiff CarProof Corporation ("CarProof" or "Plaintiff") hereby alleges the following facts and claims against HyperQuest, Inc. ("HyperQuest"), Audatex Holdings, LLC, Audatex Holdings, Inc., Audatex North America, Inc., and Audatex Canada Holdings, Inc. (collectively "Audatex"), and Solera Holdings, Inc. ("Solera"; collectively, HyperQuest, Audatex, and Solera are "Defendants").

### I.  NATURE OF ACTION.

1.      CarProof brings this action simply to get what it bargained for.  CarProof negotiated and entered into a signed contract with HyperQuest in July 2014 (the "Agreement").  Within days, however, HyperQuest refused to honor the deal.  That refusal, CarProof later discovered, was orchestrated by HyperQuest's parent and sibling companies, Solera and Audatex, respectively.  Solera and Audatex continued to meddle in CarProof's and HyperQuest's affairs, with the apparent aim of preventing CarProof from ever receiving data that it was rightfully owed under the Agreement.  Despite HyperQuest's wrongful about-face and Solera's and Audatex's oppressive interference, CarProof nonetheless continued to seek to reach a

1

981472

business solution.  It spent months negotiating and documenting a revised term sheet with Defendants to resolve all disputes—only to have them, once again, refuse to keep their word. Having been misled and mistreated twice now, CarProof can only conclude that Defendants are unwilling or unable to honor the Agreement, forcing CarProof to file this lawsuit.  Defendants' intentional misconduct, detailed below, has inflicted irreparable harm on CarProof as well as untold millions of dollars of compensable damages.

## II.    JURISDICTION AND VENUE.

2.     This Court has original jurisdiction under 28 U.S.C § 1332(a) because the parties are diverse.  Plaintiff CarProof is a Canadian corporation, headquartered in London, Ontario, Canada.  Each of the Defendants is incorporated in the United States and does business in Illinois.

3.     This Court has personal jurisdiction over Defendants.  The Court has general personal jurisdiction because Defendants are authorized to do business and in fact do business in this district and have sufficient minimum contacts with this district.  HyperQuest's headquarters, principal place of business, and nerve center are located within this forum in Buffalo Grove, Illinois; on information and belief, Solera's and Audatex's contacts with this forum are continuous and systematic.  The Court also has specific personal jurisdiction over the Defendants because they have purposely availed themselves of the privilege of conducting activities in this forum, and CarProof's claims arise out of Defendants' forum-related activities.  On information and belief, were it not for HyperQuest's breach of contract in this forum, the data that HyperQuest is contractually obligated to provide to CarProof would have originated from HyperQuest's headquarters (or, at a minimum, the data would have been controlled by technical personnel at HyperQuest's headquarters).  Solera and Audatex have both purposefully availed themselves of the privilege of conducting business in this forum, and CarProof's injury directly

2

arises out of Solera's and Audatex's interference in this forum with HyperQuest's contractual performance.

4. Venue is proper in this district under 28 U.S.C §§ 1391(b)(1)–(2), (c). Defendants reside in this judicial district because they are subject to personal jurisdiction here and a substantial part of the events and/or omissions giving rise to the claims occurred here.

## III. PARTIES.

### A. Plaintiff.

5. CarProof is a privately-held Canadian corporation headquartered in London, Ontario, Canada.  CarProof's principal business is the sale of detailed vehicle-history reports that are used by car sellers and car buyers to establish accurate, real-time information about a vehicle's past.  CarProof searches numerous data sources in Canada and the United States and any given report it provides may contain any or all of the following data: a vehicle identification number and decode; vehicle-registration information; lien details (such as liens from car loans); a stolen-vehicle check; import records; branding information; recall data, auction declarations; odometer records; service, maintenance and repair records; and accident data (including insurance claims, damage estimates, and police-reported accident information).[1]  A CarProof vehicle-history report establishes trust and transparency between a used-car buyer and a used-car seller by removing the guesswork about a vehicle's past and replacing it with impartial and accurate data.

### B. Defendants.

#### 1. Solera.

6. Defendant Solera Holdings, Inc. is a public corporation that is organized under the laws of Delaware and has its headquarters at 7 Village Circle, Suite 100, Westlake, Texas,

---

[1] *See, generally,* "Compare CarProof Products," *available at* https://www.carproof.com/products/why-carproof/compare-products.

981472

76262.  Solera's and/or its various subsidiaries provide software and services for the automobile-insurance claims-processing industry.  Solera began operations in 2006 by using private-equity funds to acquire Automatic Data Processing, Inc., which is now known as Audatex.[2]  Since then, Solera has acquired over a dozen different firms in the automobile-insurance claims-processing industry, including another defendant in this action, HyperQuest.[3]

7.      Solera purports to be formally structured as a holding company, but as will be explained in further detail below, Solera conducts itself with no regard for the corporate form.  Specifically, Solera conducts its routine corporate activity through officers who hold themselves out as being officers of Solera subsidiaries, not officers of Solera Holdings, Inc.  And, at least in several specific instances detailed below, Solera has, on information and belief, authorized operating executives of one subsidiary to speak on behalf another subsidiary.

8.      Key Solera executives involved in the misconduct alleged below include: Mr. Tony Aquila (Founder, Chairman of the Board, Chief Executive Officer, and President) and Mr. Jason Brady (Senior Vice President, General Counsel, Secretary, and Director of Mergers and Acquisitions).

### 2.      Audatex.

9.      The Audatex Defendants are all private corporations that are organized under the laws of Delaware and all have their headquarters at 15030 Avenue of Science, Suite 100, San Diego, CA 92128.  Audatex provides software and services related to insurance estimates for automobile-accident damage.  Although Audatex and its employees have begun to refer to Audatex as "AudaExplore," the complaint refers to the company as Audatex because, on information and belief, that is the company's official corporate name.

---

[2] Solera 2014 Annual Report at 1, *available at*
http://www.sec.gov/Archives/edgar/data/1324245/000132424514000072/slh630201410k.htm
[3] *Id.* at 13–14.

4

10.     Key Audatex executives involved in the misconduct alleged below include: Mr. Ray Suberlak (General Counsel, Americas), Anthony Giagnacovo (Managing Director, Canada), and Evangelos Antypas (Managing Director, United States).

### 3.     HyperQuest.

11.     Defendant HyperQuest, Inc. is a private corporation that is organized under the laws of Delaware and has its principal place of business at 2150 E. Lake Cook Road, Suite 1010, Buffalo Grove, Illinois, 60089.  HyperQuest provides software and services related to automobile-insurance estimates for accident damage incurred by motor vehicles.  Some of these estimates are generated by software provided to car-repair shops by Audatex.  In 2013, Solera acquired 100% of HyperQuest's outstanding shares.[4]

12.     Key HyperQuest executives involved in the events alleged below include: Jeff Hogan (originally Founder and CEO, then—after the acquisition by Solera—General Manager and President).

### IV.     GENERAL ALLEGATIONS.

#### A.     CarProof vehicle-history reports and accident data.

13.     As explained above, CarProof sells vehicle-history reports in Canada. Prospective car buyers purchase a CarProof report so that they can learn the full details about a vehicle, identify any significant problems with a vehicle before buying it, and make a purchase with complete peace of mind.  Prospective car sellers—such as used-car dealerships—purchase CarProof reports so that they can show buyers that they're upfront and open to disclosing the full history of a vehicle, right from the start.

---

[4] *See* "Solera Holdings, Inc. Acquires HyperQuest, Inc.; Acquisition Will Strengthen U.S. Claims Solutions" (Feb. 1, 2013), *available at* http://ir.solerainc.com/phoenix.zhtml?c=210437&p=irol-newsArticle&ID=1780529.

981472

14.     One of the most valuable aspects of a CarProof vehicle-history report is that it provides potential car buyers with detailed information on vehicle accidents, damage, and repairs.  CarProof is able to provide the most accurate and up-to-date accident and repair information by obtaining data that originates at car-repair shops and automobile-insurance companies.  This data relates to automobile-repair estimates, which in the industry is called "estimatics" data.  This estimatics data is often the first indication that a vehicle was involved in an accident, and for CarProof's purposes, it contains critical details about the nature and extent of the damage.

15.     HyperQuest provides software and services related to estimatics data, and has developed a massive database of estimatics data on automobile accidents and repairs.

**B.     CarProof and HyperQuest negotiate and execute the Agreement.**

16.     In or about June 2014, HyperQuest and CarProof began negotiations on a commercial deal so that CarProof would receive HyperQuest's estimatics data in return for a fee. On June 17, top executives for each party met in London, Ontario at CarProof's headquarters.  In the negotiations, CarProof was represented by Paul Antony, the company's Founder, CEO, and President, and Elias Olmeta, the head of corporate development.  Also in attendance on occasion was Holden Rhodes, the company's General Counsel.  HyperQuest was represented by Jeff Hogan, its General Manager and President (the most senior executive officer at the company). After several hours of discussions, the two sides agreed in principle on the deal terms and further agreed to memorialize their agreement-in-principle in a pair of written agreements.  One agreement—the "Historical Data License Agreement"—would give CarProof access to previously collected data.  The other agreement—the "Software Distribution and Data Licence Agreement"—would give CarProof access to data that would be collected in the future, as well as permission to distribute HyperQuest's "Link" software.

6

981472

17.     A week later, CarProof sent the first drafts of these agreements to HyperQuest. On information and belief, HyperQuest's representatives were located in this forum throughout the ensuing negotiations.  On July 3, 2015, HyperQuest sent back its redlines.  A few days later, on July 9, Mr. Hogan spoke by telephone with Mr. Rhodes and Mr. Olmeta to negotiate specific language in the final agreements.  In the meantime, technical personnel at each company began coordinating on the transmission and format of the estimatics data feed from HyperQuest to CarProof.

18.     During the negotiations, HyperQuest was represented by outside counsel who made numerous suggested changes to the draft agreements—changes that HyperQuest communicated on various conference calls and in redlines to the draft agreements.  For example, on July 11, Mr. Hogan forwarded CarProof a new set of redlines that appear to have been prepared by HyperQuest's outside counsel, Gerald L. Jenkins of Goldberg Kohn in Chicago, Illinois.  Official notice under the agreement was to be copied to Goldberg Kohn.  The parties exchanged additional edits on July 14 and July 15.  And on July 16, Mr. Hogan emailed Mr. Olmeta to tell him that he was in "Westlake", Texas at Solera's headquarters.  The next evening, on July 17, Mr. Olmeta sent CarProof's "final comments" to Mr. Hogan.

19.     On July 21, CarProof's Chief Technical Officer reported that HyperQuest had successfully transmitted a "test file" to CarProof's system and that CarProof was "prepared to receive data."  On information and belief, HyperQuest personnel sent that test file from this forum.  That same day, CarProof's General Counsel—Mr. Holden Rhodes—executed the final CarProof-HyperQuest agreements and sent copies to Mr. Hogan by email.  *See* Exhibit A.[5]  As

---

[5] While Agreement § 10(d) appears to permit disclosure for litigation purposes, in an abundance of caution, CarProof has not attached the Agreement to this public complaint.  Once this action is initiated, CarProof will file the Agreement under seal.

Mr. Rhodes explained in his message, one of the few, small changes he had made to the final agreements was to replace the "Draft" header on each page with the phrase "Execution Version."

20.     The next morning, on July 22, Mr. Hogan replied by email and explained, "I am on the road but received approval a couple moments ago." *See* Exhibit B. On information and belief, Mr. Hogan was referring to "approval" from Solera, the corporate parent of HyperQuest. Mr. Hogan continued, "Wanted to get you my execution page. I am very excited about our relationship, as it is going to be a strategic and valuable relationship for all our businesses— CarProof, HyperQuest, and Solera." *Id.* Mr. Hogan attached a PDF to his email that was titled "CarProof-HyperQuest – Software Distribution and Data Licence Agreement – HQ Execution 7-22-14.pdf." *Id.* The attachment was a one-page PDF of the signature page from the CarProof-HyperQuest Software Distribution and Data Licence Agreement, except the header on Mr. Hogan's signature page still contained the word "Draft" rather than "Execution Version." But based on Mr. Hogan's message, he plainly intended for that PDF to signify HyperQuest's commitment to the Agreement. Indeed, Mr. Hogan closed his message by stating that he would ask his technical personnel to "arrange the first feed" of estimatics data. *Id.*

**C.     Solera and Audatex unlawfully interfere with the Agreement.**

21.     Within days, Solera and Audatex began interfering with the Agreement. Jeff Hogan told Mr. Olmeta that—after executing the signed Agreement—he had been instructed by Solera and/or Audatex executives not to contact any executives at CarProof. And Jeff Hogan also reported that he no longer would turn on the contractually mandated data feed.

22.     On August 8, 2014, Audatex's General Counsel—Ray Suberlak—sent a letter to Paul Antony, CarProof's founder, Chairman, and at the time, CEO. Despite the negotiation-and-consummation history recounted above, he claimed that CarProof and HyperQuest had merely been involved in "negotiations concerning the possible licensing" of data. Although Mr. Suberlak described himself as Audatex's General Counsel, he announced, on behalf of

8

HyperQuest, "and its affiliated entities in the Solera Group of companies," that he was "terminating" the "negotiations" because—in his opinion—"no binding and enforceable agreement has been entered into." Mr. Suberlak also told Mr. Antony that if CarProof was "interested in discussing an alternate means to obtain access" to the HyperQuest data, CarProof would need to negotiate with Audatex executives: either Mr. Giagnacovo (Audatex Managing Director, Canada) or Evangelos Antypas (Audatex Managing Director, United States). *Id.* Even though Messrs. Suberlak, Giagnacovo, and Antypas have described themselves as being officers of Audatex, their conduct and statements demonstrate, on information and belief, that they purport to act on behalf of Solera and all of its "affiliated entities."

23. According to Mr. Hogan (and confirmed by later conversations involving Audatex and/or Solera executives), Solera, despite not having been a party to the extensive negotiations that culminated in a signed agreement, contended that the CarProof-HyperQuest Agreement was not valid, for three reasons that do not withstand the slightest scrutiny.

24. *First*, Solera claimed that the CarProof-HyperQuest Agreement had never been reviewed by outside counsel. That contention is irrelevant, but also demonstrably false. The negotiation correspondence that Mr. Hogan exchanged with CarProof shows that HyperQuest's outside counsel edited the draft agreements on several occasions.

25. *Second*, Solera claimed that Mr. Hogan never had the proper corporate authority to sign the Agreement. When he negotiated and signed the agreement, Mr. Hogan was HyperQuest's Managing Director and President, which, on information and belief, was the highest-ranking executive at HyperQuest. Mr. Hogan repeatedly represented that he did have the authority to sign. And in §§ 11(a)(i)–(iii) of the Agreement, HyperQuest represented and warranted that it ***did*** have the authority to "execute" the Agreement and to "perform its obligations" under the Agreement. Finally, when providing his signature page, Mr. Hogan explained that he had just "received approval" to enter the agreement. *See* Exhibit B.

9

981472

26. *Third*, Solera claimed that the agreements were not valid because Mr. Hogan had signed a signature page that still said "Draft" in the header. But, of course, Mr. Hogan's cover email explained that this signature page affirmed HyperQuest's commitment to the final Execution Version of the Agreement, as did his promise to ask technical personnel to "arrange the first feed" of estimatics data.

27. The true motivations behind Solera's interference quickly became apparent. Solera (on behalf of itself and its other subsidiaries) had decided that it wanted a better financial deal. Anthony Giagnacovo, the Managing Director for Audatex Canada, spoke directly with CarProof executives regarding his belief that CarProof had struck "too good a deal" with HyperQuest. As background, CarProof had—and continues to have—a data-license agreement with Audatex to obtain similar but different estimatics data. Mr. Giagnacovo told CarProof that CarProof was "his customer," not HyperQuest's customer, and that he was "pissed off at Jeff Hogan" for signing the Agreement. Mr. Giagnacovo also complained that HyperQuest was charging less than Audatex charged for similar estimatics data. Mr. Giagnacovo expressed concern that CarProof would have no interest in continuing to pay $6 million per year for Audatex data if it could get similar data from HyperQuest for a lower price.

28. Solera's Founder, Chairman, CEO, and President—Mr. Tony Aquila—subsequently suggested that Solera was interfering with the Agreement in an effort to obtain equity in CarProof. On information and belief, Mr. Aquila told CarProof's Founder and Chairman—Paul Antony—that Solera was not going to let HyperQuest transfer data to CarProof unless CarProof first sold Solera a significant equity stake.

29. This repeated and intentional misconduct by Defendants has irreparably harmed CarProof, inflicted untold millions of dollars in compensable damages, and constitutes outrageous, oppressive, and malicious behavior meriting a punitive-damages award.

10

981472

**D.    Meanwhile, Solera illegally scrapes vehicle-listing data in Canada.**

30.    In addition to collecting estimatics data, CarProof also contracts with various other data providers to obtain information on vehicles listed for sale, so called "vehicle-listings data."  Several of those providers have contracted to provide vehicle-listings data to CarProof on an exclusive basis.  This vehicle-listings data is critical to both the improvement of existing CarProof products and the development of new CarProof products.  The exclusivity provisions in these agreements have significant commercial value to CarProof.

31.    On information and belief, Solera and/or its subsidiaries (including Audatex) have been "scraping" this vehicle-listings data from a public-facing website associated with at least one of these data providers.  In this context, "scraping" means to extract data directly from webpages without the consent from the website operator.  Solera and/or its subsidiaries (including Audatex) apparently use the vehicle-listings data to develop and refine their total-loss valuation services with in-market, non-damaged, comparable vehicle prices.  This also helps insurers determine whether a damaged vehicle is a "total loss" or "totaled" (because the cost of repairs is greater than the car's actual cash value).  If a vehicle is totaled, the insurer normally pays the insured the actual cash value of a non-damaged, comparable vehicle rather than pay for expensive repairs.

32.    On information and belief, one of these data providers has notified Solera and/or its subsidiaries (including Audatex) that this data scraping is illegal under Canadian law and in violation of the data provider's terms of service.  CarProof has notified Solera, Audatex, and their representatives that the only way to legally collect the data that has been exclusively licensed to CarProof is to obtain a sublicense from CarProof.  CarProof has offered to negotiate a sublicense on reasonable commercial terms with Solera, Audatex, and its representatives—as part of a larger commercial deal—and the parties actually codified a term sheet on April 23, 2015.  But Defendants have since refused to convert the term sheet into a binding agreement.

981472

**E.      CarProof tries to resolve Defendants' business concerns but Defendants refuse to stop interfering with CarProof's contracts.**

33.      On August 13, 2014, CarProof's General Counsel—Mr. Rhodes—responded to Mr. Suberlak's letter, which had falsely suggested that the CarProof-HyperQuest Agreement was invalid.  CarProof explained that CarProof and HyperQuest were "well beyond the stage of negotiation" and that HyperQuest was already in breach of a binding agreement.  CarProof urged Mr. Suberlak to "ensure HyperQuest complies with the terms of the [A]greement," but it also agreed to meet with representatives from Solera and/or Audatex to discuss the matter further.

34.      Over the course of the next few months, CarProof's principals—chiefly Messrs. Antony and Olmeta—had a series of meetings and conversations with Solera and Audatex's representatives—chiefly Messrs. Giagnacovo and Antypas.  By February 2015, the negotiations were proceeding such that Mr. Antypas directed HyperQuest to once again prepare sample HyperQuest data files for CarProof to test and review.[6]

35.      On April 8, 2015, Mr. Antony sent a draft term sheet to Mr. Antypas encompassing a "Broader Agreement Between CarProof and Solera / Audatex."  The parties spoke by telephone on April 17 and Mr. Antony followed up on that call by emailing a "summary of what [he] thought we agreed to."  Mr. Antypas responded by email on April 21 and confirmed Mr. Antony's understanding of the main deal terms.

36.      Instead of waiting for Mr. Antypas to put together a term sheet (the previous one had taken over two months to arrive), Mr. Rhodes edited an earlier draft term sheet to represent Mr. Antypas's proposed agreement.  This was circulated to Mr. Antypas by email on April 24.

-----

[6] Mr. Antypas—ostensibly a "General Manager" at Audatex—apparently had the ability to direct the activities of HyperQuest's technical staff.  This is one of the many examples of Solera and Audatex personnel acting as though they could direct the activities of legally distinct corporations.

981472

37.    Under the terms of that deal, (1) CarProof would begin receiving HyperQuest data under an amended version of the CarProof-HyperQuest Agreement; (2) Audatex and CarProof would extend the term of the CarProof-Audatex data-license agreement; and (3) Audatex would pay CarProof for access to CarProof's vehicle-listings data for Canada and the United States. The vehicle-listings data that CarProof has acquired over the last few years represented a very significant benefit for Audatex.  CarProof offered more than twice the amount of data, and CarProof also guaranteed access to data beyond August 31 (when, on information and belief, Audatex will lose access to its main vehicle-listings-data provider).

38.    But after CarProof amended the term sheet in accordance with the terms agreed to with Mr. Antypas, Solera and Audatex again refused to respond to CarProof's requests that the deal needed to be codified in a binding agreement.

39.    In July 2015, CarProof warned Audatex and Solera that the parties needed to reach a deal shortly because certain vehicle-listings data—which was believed to be important to Audatex—would soon become exclusive to CarProof.  Instead of working towards a final, binding agreement, Solera inserted a new representative into the negotiations—Mr. Jason Brady, Solera's Senior Vice President, General Counsel, and Secretary (and its Director of Mergers and Acquisitions).  Mr. Brady ignored the detailed term sheet, which memorialized the deal that had been hammered out over many months, and instead proposed a completely new deal whereby Solera would continue to interfere in the HyperQuest deal and CarProof would give Solera access to its exclusive vehicle-listings data.

40.    CarProof declined to amend the agreement yet again.  Instead, CarProof's Founder and Chairman—Paul Antony—reached out to Solera's Founder, Chairman, CEO, and President, Mr. Tony Aquila.  Mr. Aquila insisted that Solera would not stop interfering with HyperQuest's performance of its agreement with CarProof, because—according to Mr. Aquila— the agreement was not enforceable.  In addition, Mr. Aquila declared that Solera would not allow

13

any of its portfolio companies to consummate the amended commercial deal that had been negotiated for many months if CarProof would not first agree to sell Solera an equity stake in CarProof.

41.     Mr. Antony responded that he could not agree to any equity-investment deal until a broader commercial agreement was resolved, which included extending the CarProof-Audatex Agreement, HyperQuest honoring its agreement, and CarProof providing all of its Canadian and U.S. vehicle-listings data to Audatex.  But Mr. Aquila rejected this approach, leaving CarProof no choice but to file this action.

## V.     CLAIMS AND RELIEF

### FIRST CAUSE OF ACTION
### (Breach of Contract)
### Against HyperQuest

42.     CarProof refers to and incorporates, as though fully set forth herein, paragraphs 1 through 41.

43.     CarProof and HyperQuest are parties to the CarProof-HyperQuest Software Distribution and Data Licence Agreement, which CarProof executed on July 21, 2014 and HyperQuest executed on July 22, 2014.

44.     CarProof has fully performed and satisfied all conditions, covenants, and promises required to be performed or satisfied by it under the CarProof-HyperQuest Software Distribution and Data Licence Agreement, except where performance or satisfaction was excused.  Adequate compensation was promised to HyperQuest in connection with the CarProof-HyperQuest Software Distribution and Data Licence Agreement, but that compensation is not due and owing until 30 days after HyperQuest submits a monthly invoice to CarProof for fees. HyperQuest has never submitted such an invoice to CarProof.

45.     HyperQuest has intentionally and wrongfully breached the CarProof-HyperQuest Software Distribution and Data Licence Agreement in at least the following ways:

981472

i) HyperQuest has failed to deliver the "Data" to CarProof under § 5 of the Agreement.

ii) To the extent that Defendants claim that HyperQuest did not have the authority to execute or perform the CarProof-HyperQuest Software Distribution and Data Licence Agreement, then HyperQuest has breached its representations and warranties under §§ 11(a)(i)–(iii) of the Agreement.

iii) In such other ways as may be established during discovery, such as, for example, breaches of the representations, warranties, and covenants in §§ 11(b)–(c) that require HyperQuest to provide data to CarProof on an exclusive basis.

46. HyperQuest's breaches have caused and will cause great and irreparable injury and damage to CarProof, entitling CarProof to injunctive relief, specific performance, and money damages. HyperQuest's breach of the Agreement is willful and intentional misconduct and therefore HyperQuest's liability is not limited by § 14 of the Agreement.

## SECOND CAUSE OF ACTION
### (Tortious Interference with Contract)
### Against Audatex and Solera

47. CarProof refers to and incorporates, as though fully set forth herein, paragraphs 1 through 46.

48. Audatex and Solera were aware that CarProof had entered into a valid and enforceable agreement with HyperQuest.

49. CarProof is informed and believes that Audatex and/or Solera have intentionally engaged in wrongful acts and conduct that were designed to induce a breach or disruption of the contractual relationship between CarProof and HyperQuest. The wrongful acts and conduct of Audatex and/or Solera did in fact cause a disruption in CarProof's contractual relationship with HyperQuest.

15

981472

50.     CarProof is informed and believes that Audatex and/or Solera took actions that had the purpose and effect of interfering with CarProof's contractual relationship with HyperQuest.  Audatex and/or Solera's wrongful acts and conduct interfered with CarProof's contractual relations and proximately caused CarProof damages in sums not yet ascertained.

51.     Audatex's and/or Solera's wrongful conduct in interfering with CarProof's contractual relationships, unless and until enjoined and restrained by order of this Court, will continue to cause great and irreparable harm to CarProof's business.  These wrongful acts and conduct were willful, oppressive, fraudulent, and malicious, and therefore CarProof is entitled to punitive damages according to proof at trial.

**PRAYER FOR RELIEF**

WHEREFORE, CarProof prays for judgment against Defendants Audatex, HyperQuest, and Solera as follows:

A.     Awarding general, special, and consequential damages in favor of CarProof against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.     Awarding CarProof exemplary or punitive damages in an amount sufficient to make an example of Defendants and to deter Defendants from engaging in similar wrongful conduct in the future;

C.     Awarding declaratory judgment in favor of CarProof such that the CarProof-HyperQuest Software Distribution and Data Licence Agreement is declared valid and enforceable and HyperQuest is declared to have intentionally and willfully breached that Agreement;

D.     Awarding injunctive relief in favor of CarProof such that HyperQuest is ordered to perform its obligations under the CarProof-HyperQuest Software Distribution and Data

16

981472

Licence Agreement and both Solera and Audatex are ordered to cease interfering with that Agreement;

E. Awarding CarProof costs and expenses of this action, including reasonable attorneys' fees, accountants' fees, experts' fees, and other costs and disbursements; and

F. Awarding CarProof such other and further relief as the Court may deem just and proper.

## VI. JURY TRIAL DEMANDED

Under Federal Rule of Civil Procedure 38(b), CarProof demands a trial by jury of all claims in this Complaint that are triable.

Dated: August 21, 2015

Respectfully submitted,

CARPROOF CORPORATION

By: /s/ Todd C. Jacobs
One of Their Attorneys

Todd C. Jacobs
Justin R. Donoho
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Telephone: 312-704-7700
Facsimile: 312-558-1195

*Of Counsel:*

Stuart L. Gasner
Ashok Ramani
Thomas E. Gorman
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415-391-5400
Facsimile: 415-397-7188

Attorneys for Plaintiff
CARPROOF CORPORATION

981472